FILED
OCT 31 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA :
: Criminal No. 06-264 (SEALED)
v. :
: VIOLATIONS:
JONATHAN L. MORELAND, :
: 18 U.S.C. § 1505 (Obstruction of Justice);
Defendant. : 18 U.S.C. § 2 (Aiding and Abetting)

## STATEMENT OF THE OFFENSE

Pursuant to Fed.R.Cr.P. 11, defendant JONATHAN MORELAND agrees and stipulates as follows:

1. Marc Duchesne was a citizen of the United Kingdom and resided in Houston, Texas.

2. Nationwide Capital Corporation ("Nationwide") was a Nevada corporation with offices in Houston, Texas which had de minimus assets and revenues and virtually no business operations. In July 2002, Nationwide merged with Calwest Ventures Inc. ("Calwest"), a publicly traded "shell" company which also had no significant assets, income or business. The merger of Nationwide and Calwest occurred after Duchesne and others had purchased virtually all of the outstanding shares of Calwest. At the conclusion of the merger, the surviving entity was Nationwide Capital Corporation.

3. After the merger, Nationwide became a publicly traded company under the symbol "NCCN." Nationwide had common stock registered with the United States Securities and Exchange Commission ("SEC") under the Securities Act of 1933, and from on or about August 16, 2002, through on or about October 1, 2002, the common stock of Nationwide traded on the electronic bulletin board system (the "OTC Bulletin Board") maintained by the National

Association of Securities Dealers (the "NASD"). Nationwide was required by law to file with the SEC truthful statements regarding its business affairs, including periodic reports on its financial condition and operations. On October 1, 2002, the SEC suspended trading in Nationwide securities until October 15, 2002, citing questions about statements made by Nationwide concerning its business operations, business relationships, financial condition and its acquisition of another company.

4.      Suisse Alliance Corporation ("Suisse Alliance") was a Nevada corporation controlled by Duchesne with an office in Houston, Texas.

5.      Carl von Wasserman was an alias used by Duchesne. During an interview with the SEC, Duchesne stated that Carl von Wasserman was the Chief Executive Officer of Suisse Alliance.

6.      JONATHAN MORELAND, the defendant, was a resident of Houston, Texas, and was the President of the "Financial Services Division" of Nationwide.

7.      G.M., a resident of Houston, Texas, was the President and Chief Executive Officer of Nationwide.

8.      C.P., a resident of Springfield, Virginia, was a relative of G.M.

9.      R.P., a resident of Houston, Texas, was a commercial real estate broker. In or about June 2002, R.P. began to assist Duchesne, MORELAND and others associated with Nationwide with finding commercial office space for Nationwide.

10.     Time Capital Corporation was an offshore corporation that was created by MORELAND, G.M. and others and controlled by G.M.

11.     Premier International Holdings, Inc. was an offshore corporation that was created

and controlled by MORELAND.

12.     Your Corner Office ("YCO") was a Houston based consulting firm.

13.     The SEC was an agency of the United States located at 450 5th Street, N.W., Washington, D.C. and was responsible for protecting investors and maintaining the integrity of the securities markets. As such, the SEC had regulatory and civil enforcement authority over companies such as Nationwide, whose securities were traded on the OTC Bulletin Board, as well as the officers, directors, and employees of such companies, such as defendant MORELAND and G.M.

14.     After Nationwide common shares began trading on August 16, 2002, and with the assistance of others, Duchesne devised several schemes to manipulate Nationwide's stock price, and G.M., Duchesne, MORELAND and others conspired to and did manipulate Nationwide's stock price.

### Creation of Offshore Accounts

15.     In or about May 2002, Duchesne told defendant MORELAND and G.M. to create offshore companies to hold stock. At the time, defendant MORELAND had already created Premier International Holdings, Inc.

16.     In or about June 2002, G.M., MORELAND and others created Time Capital Corporation for G.M.

### Creation of Nationwide and Distribution of Stock

17.     On or about July 23, 2002, Duchesne, G.M. and others purchased the outstanding common stock of Calwest.

18.     On or about August 6, 2002, Duchesne, G.M. and others changed Calwest's name

to Nationwide.

19. On or before August 16, 2002, Duchesne caused Nationwide common stock to be issued in the name of Suisse Alliance.

20. On or before August 16, 2002, Duchesne caused Nationwide common stock to be issued in the names of Time Capital Corporation and Premier International Holdings, Inc.

21. On or about August 16, 2002, Duchesne, G.M. and others caused Nationwide common stock to became publicly traded on the OTC Bulletin Board under the ticker symbol "NCCN."

### Matched Orders and Prearranged Trades

22. In or about August 2002, Duchesne, defendant MORELAND and others conspired to and did unlawfully manipulate Nationwide's stock price by among other actions coordinating several prearranged trades and "matched orders" (that is, a securities purchase or sale entered with the knowledge that a reciprocal order of substantially the same amount would be entered at substantially the same time for substantially the same price) for the purpose of creating a false and misleading appearance of an active and rising market in Nationwide stock and to induce others to purchase shares of Nationwide stock at artificially inflated prices.

23. On or about August 27, 2002, as defendant MORELAND well knew, G.M. and Duchesne instructed C.P. over the telephone to buy Nationwide common stock in an amount and at a price dictated by Duchesne.

24. On or about August 27, 2002, C.P. telephoned his broker and caused him to purchase 3,000 Nationwide shares at $9 per share.

25. On or about August 27, 2002, with defendant MORELAND'S knowledge,

Duchesne telephoned MORELAND'S father, O.M., and instructed O.M. to buy Nationwide common stock in an amount and at a price dictated by Duchesne.

26. On or about August 27, 2002, O.M. telephoned his broker and caused him to purchase 2,000 Nationwide shares at $9.20 per share.

### False Press Release

27. On or about September 27, 2002, Nationwide prepared and caused to be issued by wire to the District of Columbia and elsewhere a press release announcing the acquisition of YCO by a Nationwide subsidiary which contained materially false information about YCO's projected gross margins and earnings.

28. On or about September 29, 2002, Duchesne instructed defendant MORELAND to meet with two YCO executives in an attempt to convince those executives to change YCO's financial numbers so that they matched the press release that Nationwide had issued regarding the purported merger with YCO.

29. On or about September 29, 2002, Duchesne gave defendant MORELAND a copy of YCO's business plan on which he had indicated the financial numbers that needed to be changed to match the press release that Nationwide had issued regarding the purported merger with YCO.

30. On or about September 29, 2002, defendant MORELAND traveled to YCO's offices and worked with YCO executives to manipulate the company's financial numbers so that they matched the false financial numbers in the press release.

### The SEC Investigation

31. The SEC is responsible for enforcing the federal securities laws, including the Securities Exchange Act of 1934, 15 U.S.C. § 78, *et seq.*

32. Beginning in or about 2002, the SEC commenced a proceeding and directed its staff to investigate whether Nationwide and others, directly or indirectly, in connection with the offer, purchase or sale of securities: (i) may have employed, or was employing, devices, schemes, or artifices to defraud; (ii) may have made, or was making, untrue statements of material facts; or may have omitted, or was omitting, to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and may have obtained, or was obtaining, money or property by means of such statements or omissions; or (iii) may have engaged in, or was engaging in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers or other persons through, among other things, company press releases, statements on the Internet web site, and other public statements concerning, among other things: (a) the company's business operations, (b) the company's business relationships, (c) the company's current financial condition, (d) the company's acquisition of YCO, a privately held company, and (e) trading in the company's common stock by related shareholders.

33. As its investigation progressed, it was material to the SEC to determine whether Duchesne and others were fraudulently restricting the public supply of Nationwide stock in order to prevent outsiders from obtaining Nationwide shares and thus enabling Duchesne and others to manipulate Nationwide common stock and drive its stock price to artificially high levels without risk that outsiders would sell the stock and deflate the price. Thus, it was also material to the

SEC to determine, among other things, whether Duchesne used the alias Carl von Wasserman in an attempt to disguise the fact: (1) that he controlled Suisse Alliance and; (2) that he controlled the Nationwide shares that had been issued in the name of Suisse Alliance.

34. As of November 12, 2002: (1) Duchesne had admitted to MORELAND that he used the name Carl von Wasserman as an alias; (2) MORELAND had seen Duchesne sign documents with the name Carl von Wasserman; (3) MORELAND had seen an identification card in the name of Carl von Wasserman which bore Duchesne's photograph; and (4) Duchesne had received mail in the name of Carl von Wasserman while he lived in the same house as MORELAND.

35. On November 12, 2002, defendant MORELAND appeared at the offices of the SEC in the District of Columbia to testify under oath in the SEC's investigative proceedings. Defendant MORELAND was informed of the SEC's investigation and took an oath to testify truthfully in connection with that investigation. Thereafter, defendant MORELAND endeavored purposely to corruptly influence, obstruct and impede the SEC's investigation by providing the SEC with knowingly false testimony that he never knew Duchesne to use the name Carl Von Wasserman, and that he had never seen identification cards in the name of Carl von Wasserman which bore Duchesne's photograph. Moreover, MORELAND falsely claimed that while Duchesne was living with him, Duchesne had not received mail addressed to Carl von Wasserman. Specifically, on November 12, 2002, defendant MORELAND did state and subscribe the following underscored declarations that he knew were false and material to the SEC's investigation for the purpose of corruptly influencing, obstructing and impeding the SEC's investigation:

Question: Let me hand you what has been marked [SEC] Exhibit 81 .... [T]he fifth page is a letter from Washington Mutual [Bank] dated March 8, 2002 to Carl von Wasserman at [MORELAND'S home address] ....

Answer: Okay.

\* \* \*

Question: From Washington Mutual. It says, "Carl von Wasserman at [MORELAND'S address]." Did Mr. von Wasserman receive mail at [MORELAND'S address]?

Answer: <u>No, I never saw it, no.</u>

\* \* \*

Question: You don't recall ever hearing or seeing any mail to Carl von Wasserman at your address?

Answer: <u>No, no.</u>

Question: Any idea why [Duchesne's] cell phone number would be on Carl von Wasserman's checks?

Answer: <u>No, I have no idea. It is surprising. I have no idea.</u>

\* \* \*

Question: Okay, I am going to show you what has been marked as [SEC] Exhibit 82. It is a one-page document that is a photocopy of two identification cards. The first one appears to be a Swiss identification card with the name Carl von Wasserman. And the second appears to be a Florida driver's license for the name Carl von Wasserman. Take a look at those. Do you recognize either of those photographs?

Answer: Yes.

Question: Who do you recognize that to be a photo of?

Answer: [Duchesne].

Question: On both the Swiss identification card and on the Florida driver's license?

Answer: Yes.

| | |
|---|---|
| Question: | Have you ever seen [Duchesne] use the name Carl von Wasserman? |
| Answer: | <u>No.</u> |
| Question: | Have you ever seen these cards before? |
| Answer: | <u>No.</u> |
| Question: identification | Do you know any reason why [Duchesne] would have his picture on an card with Carl von Wasserman's name? |
| Answer: | <u>No.</u> |

          Respectfully submitted,

          KENNETH L. WAINSTEIN
          United States Attorney
          for the District of Columbia

By:   *[signature]*
          DAVID CAREY WOLL, JR.
          Assistant U.S. Attorney
          555 4th Street, N.W.
          Washington, D.C. 20530
          (202) 514-4250

## DEFENDANT'S ACCEPTANCE

I have read every word of this Statement of Offense. Pursuant to Fed. R. Cr. P. 11, after consulting with my attorney, I agree and stipulate to this Statement of Offense.

Date: 10/31/06

_____
Jonathan L. Moreland
Defendant

I have discussed this Statement of Offense with my client, Mr. Moreland. I concur with his decision to stipulate to this Statement of Offense.

Date: 10/31/06

_____
Elise Haldane, Esquire
Attorney for Jonathan L. Moreland